Osvaldo Carlos Linares, representing the appellant in this case. At the time the appellant was sentenced in this case, Your Honor, the range of the sentences that had been posed by this court in the same case were between 45 to up to 110 months. In the case of this specific defendant, the sentence was one of life sentence. The leader of the organization, the person who organized this group that smuggled drugs to Puerto Rico and who admitted that he had smuggled over 2,000 kilograms of cocaine to Puerto Rico, was sentenced to 46 months in prison. On the other hand, the appellant, who was not charged with being an organizer, leader, nor participating in all of the activities of the organization, was sentenced to life. Although this defendant was offered a plea agreement by the government, well within the range of the pleas that were offered to the other defendants, this defendant, sustaining his innocence, decided to try his case. We advance in our brief that we're clear that the appellant does not stand in the same position of the other defendants that pled guilty. Counsel, other than the decision to go to trial, is there anything about your client that distinguishes him from the six other co-defendants who were sentenced before him? Yes, Your Honor, and that would be that he was a participant who was partially allegedly involved in the conspiracy. The conspiracy involved the use of vessels, the use of airplanes, and it is alleged that my client was involved in ten of those trips, of the many trips that were made, using only vessels. So he's distinguished in terms that his participation was minimal as compared to other persons that were sentenced to a lower sentencing range. I thought he, I thought his passport indicated that he made, he himself made ten trips that were necessary to carry out the conspiracy. Yes, Your Honor, yes, he made ten trips to St. Thomas, and the only evidence that the person that testified against him, the cooperating defendant, was present in those trips was his own testimony, testimony of that cooperating defendant, because there's no evidence of those trips by that cooperating defendant. Well, the passports are pretty good documentation of this assertion. Yes, Your Honor, but in this case, evidence was presented, and the cooperating defendant testified that every time they traveled to St. Martin, and every time they returned to Puerto Rico, they would go through customs. It was the process that was followed. And they went through customs and submitted all the paperwork. But that paperwork, which we understand was essential in corroborating the testimony of this cooperating defendant that was getting an extremely sweet deal, was never presented by the government. The government never presented evidence that he once traveled with this, with the appellant from St. Martin to Puerto Rico, even though they have the U.S. Customs Service, from where they could obtain that evidence. Nor there was evidence that they were traveling together to St. Thomas to, excuse me, St. Martin. You mean the passport evidence wasn't actually submitted? The passport evidence related to the cooperating defendant was not submitted. Nor any other substituting evidence, Your Honor. Like, for example, records. But was the passport evidence related to this defendant? Submitted. Not the cooperating, but this defendant? With respect to this defendant, yes. But that did not put that defendant together in the same trips. Because no evidence was presented that the cooperating defendant participated in those same trips. You mean other than the testimonial evidence, which is evidence? That's the only evidence in this case, Your Honor, is that testimonial evidence. That's evidence. It is evidence, Your Honor. But when the case was, this case was filed in different phases. During the first phase of the case, my client was not indicted. The cooperating defendant was. During the testimony of the case agent, it was made clear to the court and to the jury that they did not have sufficient evidence to charge the appellant in this case, even though there were thousands of hours of recordings, word taps, even though they had multiple videotapes. So the only evidence linking my client to those trips to St. Martin, which as a matter of fact, it was testified, and Your Honor, it's pretty important. Wasn't that a matter of just credibility? I mean, he testified. I know the defendant obviously didn't appreciate the testimony, but wasn't that just a matter of credibility for the jury's determination? And it was testimony subject to cross-examination or impeachment in any other fashion the defendant could come up with. Yes, Your Honor, but efforts were made by the government, and they're always made to corroborate testimony of a person that has a lot to gain by that testimony. Well, they do try to corroborate it if they think that their evidence is weak. Obviously, they thought that they had a strong enough witness here and didn't need any further corroboration other than your client's passport. We understand, Your Honor, but nevertheless, among the efforts made by the government to try to corroborate those trips was an incident that took place on the high seas near the island of St. Thomas, where there was a rock wave that hit the vessel. And this cooperating defendant was indicating that on that particular trip, they were carrying over $1.3 million in order to pay for narcotics in St. Martin. However, when that incident took place, notwithstanding the fact that there were testimony that there were two different tow companies that operated in that area, the decision of this person who was allegedly involved in this event of carrying that huge amount of money was to call the Coast Guard. They called the Coast Guard. The Coast Guard came over. They came on board the vessel. They discussed the fact that since there was no emergency, the only thing that they could do is to transport the three occupants of the vessel to St. Thomas, but they decided that they didn't want to help the Coast Guard because they didn't want to leave the boat there. So then they contacted a tow company. So this sort of incredible testimony, and this is incredible, if you have other alternatives, why would you call a law enforcement agency to assist you in a situation such as that one when a tow company could be called? That sort of testimony was the testimony that was presented. Counsel, can I suggest you use the balance of your time to focus on the sentencing arguments? Yes, that's my intention. In terms of the sentencing of this defendant, as the court knows, and it's very brief, we indicated to the court in our sentencing memorandum that the court should consider disparity in the sentence. Did the, it appears to me from the transcript of the sentencing that the district court didn't say a word about disparity, did not respond to your argument. Is that correct? And that's a very important point, Your Honor, because the government is relying heavily in the case of USA versus San Diego. And in that particular case, the court did express that when considering disparity, the court would consider not only defendants in the same case, but national sentencing as a whole. However, there's a big difference between the Reyes-Santiago case and this particular case, because in Reyes-Santiago, this court, which definitely reviews sentencing on abuse of discretion grounds, was granted the opportunity of having a judge who indicated why he did not understand that there was a disparity in the sentence. And this court relied on the actions of the court below in determining that there was due consideration of the disparity argument. However, that was not the case with this defendant. In this defendant, notwithstanding the fact that a sentencing memorandum was filed, notwithstanding the fact that it was argued during the sentencing hearing, the court simply recited the boilerplate statement that many judges make when there's no issue. Sometimes we're entitled to infer rationales. We know that your client was the only one who chose to go to trial. The district court does not say that, but we know that for a fact. But then the district court does go into some detail about the quantities involved, all the trips that were involved, and sort of portrays your client as certainly a leading figure in carrying this out. Doesn't that all help explain why he did what he did? Yes, Your Honor. If I can answer the question. In the pre-sentence report, the client is not identified as a leader of the organization. So that representation was in no way correct on the part of the court. He was a person that allegedly participated in half of the trips that were made. As a matter of fact, during testimony in court, the covering defendant did not identify him as a leader, just as another soldier in the organization. So we understand that this court, and that's what we submit, has no way of determining whether that argument of disparity of the sentence was duly considered by the court unless some expression was made below. Because Your Honor, I as an attorney who has been practicing here for 38 years for this court in Puerto Rico, I have another case that came before the judges of this court, Christopher Lauriano, a person who was the leader of an organization of violent organization where murder allegations were brought against him in several cases. He was sentenced to 40 years. So how can we sentence a person like Christopher Lauriano to 40 years who was a leader, a person who went to trial, a person who reported many more kilograms than this other individual, the defendant in this case, and sentence this other individual, a former Marine, to life sentence? That disparity is so huge. And I believe that when it is unsplained, there's no way that this honorable court can review and ascertain whether there was an abuse of discretion. The district court seemed to take the view that because your client was a Marine, he had a family, he had a regular job for a number of years, that really, from many perspectives, his life wasn't so bad, and yet he chose to engage in this criminal enterprise with all its large social implications. It seemed to trouble the court that unlike many defendants the court might see who come from very difficult life circumstances, that wasn't true of your client. And in the judge's view, that made what he did even worse. What's wrong with that view? That view is not wrong, Your Honor, but since this is an issue of disparity, would that fact alone merit a life sentence? That is, I believe, the issue that is before this court. Thank you. Good morning. May it please the court, Mariana Balzac of the United States. I'd like to begin with addressing this issue of the sentencing disparity. The sentence in this case, a life sentence for a defendant that had personally imported over 1,000 kilograms of cocaine, that had also invested in other kilos of cocaine, that had created two shell corporations, that had laundered proceeds to the Puerto Rico lottery system. That sentence was not unreasonable. But so did Orlando. He did, Your Honor, but as... And he got less than four years. Correct, Your Honor. But Orlando is not in the same position as the defendant because he not only timely accepted responsibility, but opted to cooperate with the United States, and that put him in a situation that is materially distinguishable from the defendant. Counsel, I have... These are the sentences that were imposed on all the co-defendants. They had varying roles. 210 months, 180, 108, 78, 78, 46 for someone whose role was even greater, perhaps, than the defendant here. It is true that 46-month sentences for one who accepted responsibility and cooperated. But those really are stunning disparities. A life sentence for this appellant, those sentences for the others, and the district court doesn't say a word, not a word about the disparity issue. The court doesn't say a word about the disparity issue, but it was an issue that was before the court. Not only was it brought up in the sentencing memorandum by the defendant, which admitted that those defendants were not similarly situated to him, but it was also something that the government opposed at sentencing because they were not similarly situated. The government pointed out to the basic fact that these other defendants had timely accepted responsibility or chosen to cooperate with the United States, and that, based on the case law, they were not similarly situated to this. Shouldn't we be a little more hesitant about drawing inferences of rationale when the consequence is a life sentence? Aren't the stakes a little bit higher? It is a life sentence, Your Honor, but it's a guidelines life sentence. And the court also stated that it had considered the 3553 factors, and that should be given some weight. And one of the 3553 factors, number six, is the need to avoid unwarranted disparities. And something else, Your Honor, is that the disparity being argued here is exclusively focused on co-defendants, which is not the primary focus of disparities. The primary focus is nationwide disparities, and there's not a single argument. Primary means primary. Disparity among co-defendants doesn't mean it's irrelevant. No, Your Honor, and we're not saying it's irrelevant. It's that there is a key distinction. There's a key distinction between those defendants and dis-defendants. It's not that he went to trial. It's that he did not accept responsibility. Not even after he was convicted of trial did he accept responsibility. That puts him in a very different position before the court as to the other defendants. He accepted responsibility in going to trial, right? I mean, that's one and the same thing. Only to the extent of the part of going to trial there have been defendants that accept responsibility after the trial. That makes them eligible for a two-point reduction under the guidelines. It makes them eligible for a safety valve reduction if it's not otherwise barred. And he could have gotten up to four points reduced from his guideline range had he, after exercising his right to trial, decided that it was time to come to terms with reality and accept responsibility. But he did not do that. Of the co-defendant who got the 17 and a half years and the two that got the 15 years? They were all roughly approximately the same age, Your Honor, if memory serves me. Which is what? Approximately 40 years old. And this defendant was 47 or 48? Now, at the time of the sentencing, I believe that the pre-sentence report, if I may grab it. Thank you. He was definitely in his 40s at the time of the sentencing and that's something that the court pointed to, the court alerted to his age. And Orlando too? Orlando was about the same age. They were cousins. Do we know if the guideline sentence for any of the others would have been life? According to the plea agreements or in terms of the responsibility? The plea agreement. In the plea agreements, they were not life. They had stipulated drug quantities. They had enhancements for leadership roles and enhancements for the money laundering as well. So I believe Orlando's plea agreements ranged with something between 16 to 18 years. Correct me if I'm wrong, I think this came up earlier today that there was a remark by the sentencing judge that this defendant was a leader but the PSR doesn't say that? I don't believe that the court used the word leader at sentencing. Okay. What the court highlighted was his participation in the offense and the court referenced the fact that he made 10 trips of approximately 100 kilograms each and that he had laundered money through the Puerto Rico lottery system on at least five occasions. There was no enhancement for leadership. There was an enhancement because he had captained the boat at some point. But the court wasn't under the impression that it was sentencing the leader. But what the government did argue and something that went again or clad against the mitigating factors that the defendant had raised at sentencing, but those were the very same reasons that the defendant had been chosen to join the drug trafficking organization because he was a U.S. Marine and he would be able to handle himself in stressful situations and under pressure. And that's why, as your Honor pointed out earlier, it made this defendant stand out against the world of defendants that joined drug trafficking organizations out of necessity or for other reasons. This defendant had a career. He had been employed at the time of sentencing for 23 years with the Puerto Rico Telephone Company. So he had a means to sustain his life and yet he was a trained U.S. Marine and yet he chose to join this organization because in one trip he could make more than he did in a year. He was paid $52,500 in his first trip. He was paid originally $500 per kilogram imported and then he went up to $1,000 per kilogram imported. So in one trip to St. Martin that they could do in one weekend, he would make $100,000. And in those trips that he didn't participate, he was able to invest. So he was not just a transporter, he was able to invest in kilograms of cocaine and he made roughly $10,000 per kilogram that he invested in. And this defendant certainly had the life as the evidence showed, a trial of a person that was having such a lucrative drug trafficking career. If the Court has no other questions, I'll rest on my brief and yield the remainder of my time to the Court. Thank you, Your Honor. Thank you both.